In the Matter of the Application of The Bank of New York Mellon, in its Capacity as Trustee or Indenture Trustee of 530 Countrywide Residential Mortgage-Backed Securitization Trusts, Petitioner, For Judicial Instructions Under CPLR Article 77 On the Distribution of a Settlement Payment.


150973/2016

Mayer Brown LLP, New York City (Matthew D. Ingber, Michael O. Ware, and Christopher J. Houpt) for petitioner The Bank of New York Mellon, as Trustee of the Covered Trusts
Quinn Emanuel Urquhart & Sullivan, LLP, New York City (Michael B. Carlinsky, Jordan A. Goldstein, and David D. Burnett) for respondents American International Group, Inc. and affiliates
Warner Partners, P.C., New York City (Kenneth E. Warner) and Gibbs & Bruns LLP, Houston, Texas (Kathy D. Patrick and Robert J. Madden) for respondents Aegon, Blackrock Financial Management, Inc., and Pacific Investment Management Company LLC
MoloLamken LLP, New York City (Steven F. Molo, Justin M. Ellis, and Laura K. Jereski) for respondents Tilden Park Capital Management LP and Prosiris Capital Management LP
Wollmuth Maher & Deutsch LLP, New York City (Michael C. Ledley) and Perry, Johnson, Anderson, Miller & Moskowitz LLP, Santa Rosa, CA (Isaac M. Gradman) for respondent TIG Securitized Asset Master Fund LP
McKool Smith, P.C., New York City (Gayle R. Klein, Robert W. Scheef, Matthew P. Rand, and Melody L. McGowin) for respondent Center Court, LLC


Saliann Scarpulla, J.

Petitioner the Bank of New York Mellon seeks judicial instructions on how to distribute a portion of the $8.5 billion settlement payment entrusted to it as trustee of 530 residential mortgage-backed securities trusts ("the Covered Trusts"). Certain certificateholders from the [*2]various trusts dispute how the settlement payment should be distributed.
In June 2011, the Bank of New York Mellon ("the Trustee") entered into a Settlement Agreement on behalf of the Covered Trusts to resolve allegations that Bank of America Corporation, BAC Home Loan Servicing LP, Countrywide Financial Corporation, and Countrywide Home Loans, Inc. breached certain representations and warranties contained in the pooling and servicing agreements ("PSAs") or sale and servicing agreements and indentures (collectively, "the Governing Agreements") for the Covered Trusts.[FN1]
Under the Settlement Agreement, each of the Covered Trusts is designated to receive a specified portion (an "Allocable Share") of the $8.5 billion settlement payment.
Shortly after the settlement was executed, the Trustee commenced an Article 77 proceeding to obtain court approval of the Settlement Agreement. On January 31, 2014, Justice Barbara Kapnick approved the majority of the Settlement Agreement, with the exception of the release for loan modification repurchase claims. Subsequently, the First Department affirmed and modified Justice Kapnick's decision to "approve the settlement in all respects, including the aspect releasing the loan modification claims." In re Bank of New York Mellon, 127 AD3d 120, 128 (1st Dep't 2015).
On February 5, 2016, the Trustee commenced this proceeding seeking interpretation of the Settlement Agreement, i.e., specific instructions on how the settlement payment should be distributed. On that date, I directed any interested persons to submit an answer to the petition by March 4, 2016. I further directed the Trustee to place the settlement payment in escrow during the pendency of this proceeding.
On May 12, 2016, I issued a partial severance order and partial final judgment for five hundred and twelve of the Covered Trusts, for which there was no dispute as to payment of the Allocable Share attributable to those Covered Trusts. On November 18, 2016, I issued a second partial severance order and partial final judgment for three uncontested trusts, CWALT 2007-OA2, CWALT 2007-OA10, and CWHL 2006-OA4. As per the agreement of the Trustee and those Covered Trusts, the partial judgments directed distribution according to the Standard Intex method. Fifteen disputed trusts remain.
Section 3(d) of the Settlement Agreement states that the Allocable Share for each Covered Trust shall be distributed "in accordance with the distribution provisions of the Governing Agreements . . . as though it was a Subsequent Recovery available for distribution on that distribution date."[FN2]
 The Settlement Agreement further provides that — "after the distribution of the Allocable Share" — the Trustee shall "allocate the amount of the Allocable Share for that Covered Trust in the reverse order of previously allocated Realized Losses, to increase the Class Certificate Balance, Component Balance, Component Principal Balance, or Note Principal [*3]Balance, as applicable . . . to which Realized Losses have been previously allocated . . . pursuant to the Governing Agreements."
The above distribution method set forth in the Settlement Agreement — known as the "pay first, write up second" method — has been the Trustee's typical order of operations for distributing payments among certificateholders. Notwithstanding that the Trustee has historically utilized this method, the Trustee claims that a controversy has arisen in connection with some of the Covered Trusts because the pay first, write up second method results in a distribution under which a large amount of the Allocable Share will bypass senior certificates, and will be paid out instead to junior certificates with realized losses.
This distribution result will occur for certain Covered Trusts that have an "overcollateralization" structure. The purpose of overcollateralization is to create a cushion of excess mortgage loans that will insulate the trust's certificateholders from losses. At the outset, an overcollateralized trust starts out with an initial principal balance of underlying mortgage loans that exceeds the initial principal balance of certificates. The advantage of this structure is that, in the event that a mortgage loan defaults and is written off, the remaining mortgage loans are intended to be sufficient to cover the principal balance of certificates. In general, overcollateralized trusts have a target amount of overcollateralization, referred to as an overcollateralization target amount.
The Trustee asserts that the trusts at issue are no longer overcollateralized due to the default of an unexpectedly high number of mortgage loans, which have eliminated any previously existing cushion of excess loans. In instances where the principal balance of the mortgage loans has fallen below the principal balance of the certificates, the trusts experienced write downs to maintain parity between the loan balances and certificate balances.
The Trustee explains, however, that under the pay first, write up second method, the overcollateralization targets for the trusts will "not be satisfied before the distribution or after the distribution, but during the distribution process — in between step one (payment) and step two (write up) — [when] the OC Target is temporarily, and artificially, met." The Trustee claims that, as a result of this temporary and artificial overcollateralization, a large proportion of the Allocable Share will not pay off the principal balance of senior certificates first, but will instead pay junior certificates with realized losses.
In light of this anticipated outcome, the Trustee seeks instructions on whether the Trustee should: (1) follow the Settlement Agreement and continue its practice of "pay first and write up second" but make an adjustment to the overcollateralization in order to prevent "leakage" to the junior certificates; (2) follow the Settlement Agreement and continue its practice of "pay first and write up second" but make no adjustment to the overcollateralization calculation, thus permitting leakage; or (3) change its general order of operations in the Covered Trusts to "write up first and pay second" notwithstanding the language of the Settlement Agreement.[FN3]

Certificateholders American International Group, Inc. and its affiliates (collectively "AIG") and Aegon and Blackrock Financial Management, Inc. ("Institutional Investors") argue [*4]that the first method described above (referred to as the "Standard Intex Method") should apply. Tilden Park Capital Management LP ("Tilden Park"), Prosiris Capital Management LP ("Prosiris"), and BlueMountain Credit Alternatives Master Fund L.P. and its affiliates ("Blue Mountain") argue that the second method described above should apply. Lastly, Center Court, LLC ("Center Court") seeks the third method — write up first and pay second — to be applied.
The parties raise two issues. The first issue concerns the CWABS 2006-12 trust, where one certificateholder has challenged the Settlement Agreement's choice of distributing the Allocable Share as a Subsequent Recovery. The second issue concerns whether the Standard Intex method; the pay first, write up second method; or the write up first, pay second method should apply to the fourteen remaining trusts ("the Fourteen Trusts").[FN4]

Discussion
I. CWABS 2006-12 Trust
Under the Settlement Agreement, the trust CWABS 2006-12 ("the 2006-12 Trust") is designated to receive approximately $62 million dollars as its Allocable Share. Section 3(d) of the Settlement Agreement states that the Trustee shall distribute the Allocable Share according to the distribution provisions of the Governing Agreements "as though it was a Subsequent Recovery available for distribution on that distribution date."
TIG Securitized Asset Master Fund LP ("TIG") objects to the distribution of the Allocable Share as a Subsequent Recovery. Specifically, TIG contends that treating the Allocable Share as a Subsequent Recovery is a violation of the 2006-12 Trust's Governing Agreement, and the Allocable Share must instead be treated as Excess Cash Flow.
In opposition, Pacific Investment Management Company LLC ("PIMCO") and Center Court argue that TIG's objection should be precluded because it is untimely, barred by res judicata, and not within the scope of this proceeding. They also argue that treating the Allocable Share as a Subsequent Recovery does not violate the 2006-12 Trust's Governing Agreement.
Center Court and PIMCO contend that TIG failed to raise its objection in this proceeding until June 27, 2016. Although Center Court and PIMCO argue that TIG's opposition should be stricken as untimely, I accept TIG's opposition papers. At the June 22, 2016 court conference, TIG and PIMCO informed me that they intended to submit papers by June 27, and I agreed to accept their papers by that deadline.
Next, PIMCO argues that the doctrine of res judicata bars TIG's objection because it could have been raised in the prior Article 77 proceeding before Justice Kapnick. Res judicata bars a party from litigating "a claim where a judgment on the merits exists from a prior action between the same parties involving the same subject matter." In re Hunter, 4 NY3d 260, 269 (2005). Res judicata generally precludes "claims actually litigated," but also applies to "claims that could have been raised in the prior litigation." Id.
To determine whether a claim is barred by res judicata, our courts apply a transactional analysis approach which holds that "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon [*5]different theories or if seeking a different remedy." O'Brien v. City of Syracuse, 54 NY2d 353, 357 (1981). The purpose of the res judicata doctrine is "to provide finality in the resolution of disputes" and is based on "[c]onsiderations of judicial economy as well as fairness to the parties." Reilly v. Reid, 45 NY2d 24, 28 (1978).
TIG raises an objection to the Settlement Agreement here that it did not raise in the prior Article 77 proceeding. In the prior proceeding, the Court determined that "a full and fair opportunity" had been offered "to all Potentially Interested Persons, including the Trust Beneficiaries, to make their views known to the Court, to object to the Settlement and to the approval of the actions of the Trustee in entering into the Settlement Agreement, and to participate in the hearing thereon." In re Bank of NY Mellon., 42 Misc 3d 1237(A) at 14 (Sup. Ct. New York County 2014). Because TIG had a full and fair opportunity to raise its objection to the Settlement Agreement's terms in the prior proceeding, TIG's objection in this proceeding is now barred by res judicata.[FN5]

As no other certificateholder raises an objection to the distribution of the Allocable Share as a Subsequent Recovery, I direct the Trustee to distribute the Allocable Share for the 2006-12 Trust as though it was a Subsequent Recovery, pursuant to the terms of the Settlement Agreement and the PSA for the 2006-12 Trust.
II. The Fourteen Remaining Trusts
In regards to the Fourteen Trusts, the parties dispute whether the Allocable Share should be distributed according to: (1) the Standard Intex method; (2) the pay first, write up second method; or (3) the write up first, pay second method.
The Settlement Agreement sets forth two operations that the Trustee must follow in distributing the Allocable Share for each of the Fourteen Trusts. First, the Settlement Agreement states that the Trustee shall distribute the Allocable Share to certificateholders "in accordance with the distribution provisions of the Governing Agreements . . . as though it was a Subsequent Recovery available for distribution on that distribution date" (emphasis added).
Second, the Settlement Agreement directs the Trustee to "allocate the amount of the Allocable Share for that Covered Trust in the reverse order of previously allocated Realized Losses, to increase the Class Certificate Balance, Component Balance, Component Principal Balance, or Note Principal Balance, as applicable . . . to which Realized Losses have been previously allocated . . . pursuant to the Governing Agreements."
The parties do not dispute that the distribution provisions in the Settlement Agreement direct the Trustee to pay out the Allocable Share first, and then to write up the certificates in the amount of the Allocable Share as described above. To perform the first operation, the Trustee must pay the Allocable Share as though it was a "Subsequent Recovery," as that term is defined by the Governing Agreements. Each of the Fourteen Trusts have a Governing Agreement with [*6]slightly different terms. As the parties have not pointed out any significant differences between the Governing Agreements, I treat them similarly.
Each of the fourteen Governing Agreements contain a "Section 4.02 - Priorities of Distribution," which sets forth the order of distribution of the trust's funds among the certificates on a monthly basis. The amounts available to be distributed each month are called "Available Funds." Available Funds consists of certain amounts held in the trust's Certificate Account, including payments of principal and interest from the underlying mortgage loans.[FN6]
Available Funds also include Subsequent Recoveries, which are typically unexpected recoveries from mortgage loans that have been previously liquidated.
Section 4.02 provides that Available Funds are to be distributed to certificates in the following general order: (1) interest; (2) principal in an amount called "the Principal Distribution Amount"; and (3) unpaid realized losses. Available Funds are distributed on a regular distribution date each month, which is usually the 25th of the month.
Because the Settlement Agreement requires the Allocable Share to be treated as a Subsequent Recovery, the Allocable Share must first flow into Available Funds, and then be distributed in the order established by Section 4.02. The parties do not dispute the portion of the Allocable Share that will be paid for the first category for distribution — interest.
The main dispute between the parties concerns how much of the Allocable Share will be apportioned to the second category for distribution — the Principal Distribution Amount. Funds that fall within the Principal Distribution Amount are generally paid out to certificates in order of seniority until their certificate balances equal zero.[FN7]

The express definition for "Principal Distribution Amount" is: "the excess, if any of (1) the aggregate Class Certificate Balance of the Certificates related to such Loan Group immediately prior to such Distribution Date, over (2) the excess, if any, of (a) the aggregate Stated Principal Balance of the Mortgage Loans in that Loan Group as of the Due Date in the month of that Distribution Date (after giving effect to Principal Prepayments received in the related Prepayment Period), over (b) the Group 1 Overcollateralization Target Amount or the Group 2 Overcollateralization Target Amount, as the case may be, for such Distribution Date" [*7](emphasis added). CWALT 2005-61 PSA.[FN8]

Under this definition, the Principal Distribution Amount has three components: (1) Class Certificate Balance ("Certificate Balance"); (2) Stated Principal Balance of the Mortgage Loans ("Loan Balance") and (3) the Overcollateralization Target Amount ("OT Target"). In other words, the Certificate Balance is the amount of principal owed on the certificates; the Loan Balance is the unpaid principal balance on the mortgage loans securing the certificates; and the OT Target is an established target for the Loan Balance to exceed the Certificate Balance.
Tilden Park, Prosiris, and Blue Mountain contend that the Principal Distribution Amount is calculated using the certificate balances "immediately prior" to the Distribution Date, as expressly stated in the Principal Distribution Amount definition. They further assert that the Principal Distribution Amount should be calculated using the simplified formula: Certificate Balance less (-) Loan Balance plus (+) OT Target.
In contrast, AIG and the Institutional Investors argue that the Principal Distribution Amount should be calculated using certificate balances that have first been adjusted upward in the amount of the Allocable Share on the Distribution Date, and the Principal Distribution Amount should then be paid out based on pre-distribution certificate balances. AIG and the Institutional Investors argue that this distribution method is consistent with the text of the Governing Agreements, as well as the overcollateralization and subordination features of the Fourteen Trusts.
Center Court agrees with AIG and the Institutional Investors that the Principal Distribution Amount should account for the amount of the Allocable Share. However, Center Court argues that the Governing Agreements require a write up first, pay second distribution. First, Center Court asserts that Available Funds must exclude a Subsequent Recovery in the month that it is received because it falls within the "Amount Held for Future Distribution." Second, Center Court claims that, even though a Subsequent Recovery is withheld for distribution in the month it is received, a Subsequent Recovery must be allocated to increase certificate balances in the month that it is received. As a result of this timing, Center Court concludes that certificate balances must be written up first in the amount of the Allocable Share, and then distributed to certificates.
The practical difference between the parties' positions is that: (1) under Tilden Park, Prosiris, and Blue Mountain's interpretation, the Principal Distribution Amount essentially equals the OT Target, and (2) under AIG, the Institutional Investors, and Center Court's interpretation, the Principal Distribution Amount essentially equals the Allocable Share plus the OT Target.
An illustration of the difference between the two positions follows. Assuming that a trust's Allocable Share is $56 million, and its OT Target is $6.3 million,[FN9]
under the pay first, write up second method, the Principal Distribution Amount is equal to the Certificate Balance minus (-) the Loan Balance plus (+) the OT Target. Because the Certificate Balance and Loan [*8]Balance are equal (due to the lack of overcollateralization), the Principal Distribution Amount equals the OT Target, i.e., $6.3 million.
Under the Standard Intex method, the Principal Distribution Amount is equal to the Certificate Balance plus (+) the Allocable Share minus (-) the Loan Balance plus (+) the OT Target.[FN10]
Again, as the Certificate Balance and the Loan Balance are equal and cancel each other effectively, the Principal Distribution Amount equals the Allocable Share plus (+) the OT Target — i.e., $56 million + $6.3 million, or $62.3 million.[FN11]

Thus, under the pay first, write up second distribution method, the Principal Distribution Amount is $6.3 million, which goes to pay senior investors until their certificate balances equal zero, with the remainder of the Allocable Share to pay certificates with realized losses in order of seniority.
However, under the Standard Intex method, the Principal Distribution Amount is $62.3 million, which means that the entire Allocable Share remaining after interest goes to pay investors in order of seniority until their certificate balances equal zero. As shown by this example, the parties' positions result in a significant disparity in how the Allocable Share is distributed.
Although the parties sharply dispute how the Principal Distribution Amount should be calculated, the Governing Agreement provides a straightforward directive regarding the amounts that need to be gathered, added together, and subtracted in order to calculate the Principal Distribution Amount. The definition of the Principal Distribution Amount states that it is the amount equal to the excess of the "Class Certificate Balance . . . immediately prior to such Distribution Date" over the excess of the "Stated Principal Balance of the Mortgage Loans" over the Overcollateralization Target Amount, i.e., Certificate Balance less (-) Loan Balance plus (+) OT Target — the same formula put forth by Tilden Park, Prosiris, and Blue Mountain.[FN12]
As the Governing Agreements expressly indicate how to calculate the Principal Distribution Amount, the Trustee must follow this definition to calculate what portion of the Allocable Share must be distributed to certificateholders as the Principal Distribution Amount.
AIG and the Institutional Investors argue that the text, overcollateralization, and subordination features of the Fourteen Trusts' Governing Agreements require the Trustee to distribute the Allocable Share using the Standard Intex method. The Standard Intex method, however, adds an extra step — the addition of the Allocable Share — that is not reflected anywhere [*9]in the definition of the Principal Distribution Amount. While AIG and the Institutional Investors assert that the text of the Governing Agreements support distribution according to the Standard Intex method, there is no textual basis in the Governing Agreements for adding the Allocable Share to the calculation of the Principal Distribution Amount.
I fully agree with AIG and the Institutional Investors that the overcollateralization and subordination features of the Governing Agreements are designed to protect senior investors and ensure that they are paid their principal first. However, the parties plainly understood when they negotiated the Settlement Agreement that there could be instances where the Governing Agreements' general subordination scheme may not apply. Indeed, at oral argument on August 31, 2016, the Trustee's counsel expressly admitted that "Section 3(d)(1) of the settlement agreement provides that, 'once the allocable shares has hit those accounts, the trustee shall distribute it to investors in accordance with the distribution provisions of the governing agreements.' So that it was our understanding, then and now, that there could be different results obtaining a (sic) different trusts.
Further, Trustee's counsel stated "[t]hese are — with these common law PSAs are basically all equity rather than debt, but most of them look like debt. This is the one that looks like equity. And so the settlement agreement does contemplate what classes other than the highest most might get some. And it draws the line below which they won't go . . . [depending on] [w]hatever the PSA or the indenture said." Accordingly, the general intent of the Governing Agreements to protect senior certificateholders over junior certificateholders does not operate to override the plain and unambiguous terms of the Settlement Agreement, which directs that the Allocable Share must be distributed as a Subsequent Recovery.
In addition, I find Center Court's argument for a write up first, pay second distribution method to be unpersuasive. Though Center Court correctly points out that the definition of "Available Funds" excludes the "Amount Held for Distribution," the Settlement Agreement expressly requires the Allocable Share to be treated as though it were a Subsequent Recovery available for distribution on the Distribution Date. The Allocable Share flows into Available Funds, and is not an Amount Held for Distribution that will be distributed in the following month. Further, contrary to Center Court's interpretation, the Governing Agreements require the Principal Distribution Amount to be calculated using certificate balances immediately prior to the Distribution Date, and not as of any date.
As an alternative argument, AIG contends that the Settlement Agreement and Governing Agreements are ambiguous. AIG asserts that the Court should interpret the Settlement Agreement and the Governing Agreements in keeping with the "clear intent of the parties. . . that the most senior tranches are paid first and the more junior tranches would generally receive nothing from the settlement." However, because the Settlement Agreement and Governing Agreements are clear regarding how the Allocable Share must be distributed and how the corresponding Principal Distribution Amount must be calculated, I decline to find an ambiguity in the agreements. "Courts should not strain to find contractual ambiguities where they do not exist." Diaz v. Lexington Exclusive Corp., 59 AD3d 341, 342 (1st Dep't 2009).
AIG further contends that distributing a significant portion of the Allocable Share to junior certificates with realized losses must be avoided because it is a commercially absurd result. AIG appears to argue that, in light of this absurd result, the Court should supply terms to the Settlement Agreement and Governing Agreements to ensure that the Allocable Share is distributed pursuant to the Standard Intex method.
Under New York law, even in the absence of a claim for reformation, courts "may as a matter of interpretation carry out the intention of a contract by transposing, rejecting, or supplying words to make the meaning of the contract more clear." Wallace v. 600 Partners Co., 86 NY2d 543, 547 (1995). This "approach is appropriate only in those limited instances where some absurdity has been identified or the contract would otherwise be unenforceable either in whole or in part." Id.
Here, it is neither an absurd or unenforceable result that the Principal Distribution Amount calculated under the Governing Agreements may be small in proportion to the entire amount of the Allocable Share, resulting in the majority of the Allocable Share to be distributed to certificates with realized losses, particularly because the parties anticipated that this result might occur. Even if this distribution can be characterized as unusual, terms that are "novel or unconventional" do not render a result absurd. Wallace, 86 NY2d at 548; Jade Realty LLC v. Citigroup Commercial Mortg. Trust 2005-EMG, 20 NY3d 881, 884 (2012). Moreover, it is not absurd that, once the Principal Distribution Amount is distributed, it is in fact the senior certificates with realized losses that will be paid first before junior certificates with realized losses.[FN13]

Lastly, AIG and the Institutional Investors argue that the Settlement Agreement's purpose will not be achieved if the Allocable Share is primarily distributed to junior certificates with realized losses. They argue that the purpose of the Settlement Agreement is to compensate certificateholders for past and future losses caused by the alleged breaches of representations and warranties, but that the pay first, write up second method will result in a distribution based primarily on past losses only.[FN14]

While I understand that the plain language of the Settlement Agreement and Governing Agreements do not reflect the senior certificateholders' belief as to how Allocable Shares would be distributed with respect to these few trusts, I may not look beyond the four corners of the relevant agreement to determine the parties' intent, when the contract language itself is clear.[FN15]
[*10]Where the "parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." W.W.W. Assocs., Inc. v. Giancontieri, 77 NY2d 157, 162 (1990); Vision Dev. Grp. of Broward Cty., LLC v. Chelsey Funding, LLC, 43 AD3d 373, 374 (1st Dep't 2007). In the interpretation of contracts, our courts are concerned "with what the parties intended, but only to the extent that they evidenced what they intended by what they wrote." Rodolitz v. Neptune Paper Prods., 22 NY2d 383, 387 (1968) (internal citation omitted).
The parties to the Settlement Agreement undoubtedly set out to create one global settlement to resolve the claims of 530 trusts, each with differing Governing Agreements. Through undoubtedly difficult and lengthy negotiations, the parties chose the defined term "Subsequent Recovery" as set forth in the differing PSAs — a choice that is responsible for the outcome in this decision.
In interpreting contracts, courts look "to the objective meaning of contractual language, not to the parties' individual subjective understanding of it." Ashwood Capital, Inc., 99 AD3d at 6. Our courts "apply this rule with even greater force" — in cases like this one — involving "commercial contracts negotiated at arm's length by sophisticated, counseled businesspeople." Id. Upon careful examination of the plain language of the Settlement Agreement and Governing Agreements, I find that their objective meaning is to direct the Trustee to distribute the Allocable Shares for the Fourteen Trusts using the pay first, write up second method, which includes the calculation of the Principal Distribution Amount pursuant to the terms of the Governing Agreements.
Tilden Park and Prosiris also request that the Trustee distribute the Allocable Shares for the Fourteen Trusts as of February 25, 2016 — the next distribution date after this proceeding was commenced. They argue that I should direct distribution as of this date based on the Institutional Investors' attempt to delay this proceeding in order to divert payment to themselves.
I agree with AIG and the Institutional Investors that there is no support in the Governing Agreements for a distribution to relate back to a prior set of certificate balances. Further, I note that the two partial judgments previously entered in this proceeding directed distribution as of the next available distribution date, and did not relate back to February 2016. I do not find any reason to depart from that procedure in this case. I therefore direct the Trustee to distribute the Allocable Share for the Fourteen Trusts on the next available distribution date, in accordance with this decision.
Lastly, I deny the petitioner's request for: (a) an order that the Court shall retain exclusive jurisdiction over this matter for the purposes of rendering additional instructions as are necessary or appropriate in the administration of the Covered Trusts; and (b) an order barring litigation of the questions raised herein outside the context of this proceeding. If the parties need additional instructions or an order barring further litigation of the questions raised here, the parties may [*11]seek such relief as necessary.
In accordance with the foregoing, it is hereby:
ORDERED that the branch of the Bank of New York Mellon's petition seeking judicial instructions related to CWABS 2006-12 is severed and granted as described above; and it is further
ORDERED that the branch of the Bank of New York Mellon's petition seeking judicial instructions related to CWALT 2005-61, CWALT 2005-69, CWALT 2005-72, CWALT 2005-76, CWALT 2005-IM1, CWALT 2006-OA10, CWALT 2006-OA14, CWALT 2006-OA3, CWALT 2006-OA7, CWALT 2006-OA8, CWALT 2007-OA3, CWALT 2007-0A8, CWMBS 2006-3, and CWMBS 2006-OA5 is severed and granted as described above.
Settle judgments.
This constitutes the decision and order of the Court.
Dated: March 31, 2017
SALIANN SCARPULLA, JSC



Footnotes

Footnote 1:Countrywide Home Loans, Inc. is the originator and seller of the residential mortgage-backed securities, and Countrywide Financial Corporation is its parent company. BAC Home Loans Servicing, LP (formerly known as Countrywide Home Loan Servicing, LP) is the master servicer of the loans, and Bank of America Corporation is its parent company. In July 2008, Bank of America acquired Countrywide.

Footnote 2:The Settlement Agreement also provides that in the event that the Governing Agreement does not define "Subsequent Recovery," the Allocable Share must be distributed "as though it was unscheduled principal available for distribution on that distribution date."

Footnote 3:The petition further seeks: (a) an order that the Court shall retain exclusive jurisdiction over this matter for the purposes of rendering additional instructions as are necessary or appropriate in the administration of the Covered Trusts; and (b) an order barring litigation of the questions raised herein outside the context of this proceeding.

Footnote 4:The Fourteen Trusts are: CWALT 2005-61, CWALT 2005-69, CWALT 2005-72, CWALT 2005-76, CWALT 2005-IM1, CWALT 2006-OA10, CWALT 2006-OA14, CWALT 2006-OA3, CWALT 2006-OA7, CWALT 2006-OA8, CWALT 2007-OA3, CWALT 2007-0A8, CWMBS 2006-3, and CWMBS 2006-OA5.

Footnote 5:TIG argues that treating the Allocable Share as a Subsequent Recovery is a violation of the 2006-12 Trust's Governing Agreement. Even if I were to entertain the merits of this argument, I find it to be unpersuasive. Although TIG is correct in pointing out that the Allocable Share does not fit within the definition of "Subsequent Recovery" as it is not a recovery on a liquidated mortgage loan, the Allocable Share is nevertheless to be distributed "as though it was a Subsequent Recovery."
Footnote 6: See e.g., CWALT 2005-61, Section 3.05.
Footnote 7:The PSAs contain specific directions regarding how the Principal Distribution Amount must be distributed. For example, the PSA for CWALT 2005-69 states, at Section 4.02, that the Principal Distribution Amount shall be paid sequentially: "(i) to the Class A-R Certificates, until its Class Certificate Balance is reduced to zero; (ii) concurrently, to the Class A-1, Class A-2 and Class A-3 Certificates, pro rata on the basis of their respective Class Certificate Balances immediately prior to such Distribution Date, until their respective Class Certificate Balances are reduced to zero; and (iii) sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5 and Class M-6 Certificates, in that order, until their respective Class Certificate Balances are reduced to zero."
Footnote 8:The PSAs for the other thirteen trusts at issue contain substantially similar definitions for Principal Distribution Amount.

Footnote 9:The example of Allocable Share and OT Target amounts are taken from AIG's memorandum of law.
Footnote 10:In its memorandum of law, AIG argues that the Standard Intex method should apply and cites to the affidavit of James K. Finkel, which contains a formula for calculating the Principal Distribution Amount, i.e., (Certificate Balance + Allocable Share) — (Loan Balance — OT Target). This formula can be simplified to Principal Distribution Amount = Certificate Balance (+) Allocable Share (&mdash) Loan Balance (+) OT Target, as shown above.

Footnote 11:Center Court's method results in the same Principal Distribution Amount as the Standard Intex method. However, the Allocable Share is added first to increase the Certificate Balance amount, rather than separately adding in the Allocable Share as under the Standard Intex method. 

Footnote 12:More specifically, this equation is derived from Certificate Balance — (Loan Balance — OT Target).
Footnote 13:See, e.g., CWALT 2005-61 PSA, Section 4.02(a)(4) states that the remaining Available Funds shall be distributed "sequentially, to the holders of the Class 1-A-1, Class 1-A-2, Class 1-A-3, Class 1-M-1, Class 1-M-2, Class 1-M-3, Class 1-M-4, Class 1-M-5 and Class 1-M-6 Certificates, in that order, in each case in an amount equal to the Unpaid Realized Loss Amount for each such Class."
Footnote 14:The parties argue that statements made by Trustee's counsel Jason Kravitt in the prior Article 77 proceeding support their various arguments. In the prior proceeding, Kravitt stated: "[t]he way we wrote the Settlement Agreement is that it's the tranches who are most senior who suffered losses who get the cash first, therefore, the people who are holding subordinated and most subordinated tranches, likely, will not get any cash out of the settlement if the losses in the settlement went to any of the senior level tranches . . . [W]e also set in some rules to make sure that subordinate tranches didn't get money before senior tranches."
Footnote 15:AIG and the Institutional Investors also argue that distributing a significant portion of the Allocable Share to junior certificates with realized losses is unfair because a settlement payment distributed over several months would not have resulted in the majority of the Allocable Shares to be distributed to junior certificateholders. As discussed above, it is in fact senior certificates with realized losses that will be paid before junior certificates with realized losses. In addition, the parties clearly knew that the Allocable Shares from the Settlement Agreement were enormous lump sums that would flow into the trusts, but they did not write the Settlement Agreement to account for this potential outcome.